Good morning. May it please the Court. My name is Michael Knapling. I'm here on behalf of the appellant, Pedro Antonio Flores Rodriguez, who is appealing the denial of his petition under the Hague Convention for the return of his nine-year-old daughter. In reaching its decision to deny his petition, the district court fell into a pretty standard trap that many courts fall into, which is to look at it as a custody determination as opposed to the venue determination, which is required by the Hague Convention. As a result, the court made two fundamental errors. First, it found, contrary to this court's precedent and its unfactual findings, that the petitioner, the appellant here, was not exercising his rights of custody that he had under Mexican law. In other words, that he had clearly and properly exercised his rights under Mexican law. Secondly, the court determined to give dispositive weight to the preferences of the nine-year-old child, even though there wasn't sufficient evidence of her maturity or that she really had the required particularized objection. Let me ask you about the questioning. You've got a structure here, and I'm going to throw your structure off for just a minute, but maybe you can return to it. As I understand it, the child was questioned in chambers by  the magistrate. Were the counsel, and one of your briefs, two sides, says counsel was there in the room but did not ask questions. Counsel was there in the room, is my understanding. Counsel did not ask questions. And were the questions the magistrate asked, some that the magistrate, Magistrate Love, I don't know who that is, came up with himself or were they provided by counsel? The record doesn't say I wasn't there, but reading the transcript . . . I'm taking that from your uncertainties, but that's fine. But reading the transcript, it appears that the questions were the magistrate's own, because in a couple of instances within the transcript, counsel suggests that maybe the court should ask a question here or there. What concerned me about it is I never saw the magistrate actually ask, do you object to being returned to Mexico? And I was wondering, but nonetheless, the magistrate, through inference or otherwise, determined that there was an objection. So I'm just wondering how factually we got to that point. It appears factually we got to that point because the magistrate asked the questions that the magistrate felt that he needed to be questioning. His questioning is, are you happy here? Were you happy there? And tell me about your father. And with respect to the magistrate, those actually are the wrong questions. The questions he should have been asking are, what is your objection to returning to Mexico? If you could return to Mexico in the custody of your mother, would you have an objection to that? And then actually asking her to make some comparisons and contrasting to life in Mexico versus life here. Instead, he went, as I started with, he went directly at this sort of custody determination. Who should the child live with? And who really is the best parent? And that is not a decision that the Hague Convention gives to the United States courts. I have some difficulty with the notion that the word objection has to be used. I don't understand the sense of it. But I wonder, you know, if we're going to ask these people to ask the question, do you object, that in and of itself, just standing alone doesn't—that's the language of the statute. And the case of sentence suggests that, indeed. Why can't—you look at the total exchange, the colloquial way there, and make the legal judgment as to whether or not there was an objection in the sense that the Hague Convention calls for, which means you've got to separate that or at least distinguish that. It's got to be independent of underlying judgments about who ought to be the better—to have custody. I will agree with you, Your Honor, that there is not a magic language requirement. And perhaps with a 9-year-old, you don't ask, do you object? Because that may be a concept that's a little bit above a 9-year-old. By the same token, if she's not mature enough to understand it, would you give that much weight to it? But I think the court has to ask questions that tease out the objection. As I say, comparing and contrasting life in the United States with Mexico, making these sort of rational determination of my life here versus my life back home, and trying to make sure that it's— But is this a distinction between—a choice between—of this young person between parents with whom they want to reside or between places where they want to live? The choice under the Hague Convention is places, not parents, because once you get into deciding who they want to live with— I know I don't want to go back there. I can't—Judge, I don't want to be—I can't be with him. I'm afraid of him. He abuses me or whatever. That's what happened here. I'm just trying to get the principles. I think if it does not arise to a grave risk determination, which it didn't here, the principle is it's got to be a place, because under the convention, those issues of, I don't like my father, I don't want to live with my father, I'm scared of my father, those are custody determinations, and the convention requires that American courts trust that a court in the home country, here in Mexico, will take those facts into consideration and to make the appropriate determination of with whom the child will live. Is our discussion in Vasconcelos helpful in your mind to this? Because there, I thought the court, our court, in an unpublished decision was saying, just as you said, there doesn't have to be the magical word objection, but what there has to be is some particularization by the child of one place or another. So in this case, if you've got maturity shown by the kid being able to say, I like math fractions, so we're really just looking at objection, and then the magistrate firsthand, and I think the guardian Adam Lighton was there too, right? That's correct. So everybody's there, and this magistrate then says, let's particularize where you prefer to be. I prefer to be in Texas. I'm happier here. I like it better. Under Vasconcelos, that looks like it's a credibility call that we wouldn't overturn. There, I think there are two differences between this case and Vasconcelos. First of all, in 2013. That's on the age side. Well, the two, I think the two issues are always intertwined to a certain extent, at least. But is there anything suggesting immaturity as to this child if they're talking about math and fractions? Is there any suggestion of undue influence or psychological? There's none of that that I see in this record. To me, it's whether the child objected or not. That's just how I look at it. Well, no, I would disagree with you. There's a question, too, on whether she objected and whether or not there's sufficient maturity. But there is a difference between a 9-year-old and a 13-year-old. And part When you're 16, all that drops away. If you're that close to 16, that suggests to you it's about there. That's correct. If you're 13, as opposed to 9. That's my point, Your Honor. I think you have to look at, with a 13-year-old, courts have tended to say, if you're 13, 14, 15, we're really not going to require much in the way of proof of maturity. And we're going to allow these sort of, this is what I want, and we're going to trust that a 13-year-old knows what he wants, unless there is, as in England v. England, some reasons. But where we have younger children, courts have tended not to do that, and they have tended to want more on the maturity. That interests me. What's your best circuit case that says these two are interactive, that the younger, then the more objection there has to be? What's your authority for that proposition? I think Dietz, certainly . . . Dietz is a circuit case, although it's an unpublished circuit case from this court. I think that . . . If going with my view of this, I'm happy to be dislodged. The tougher question is, what does the Hague Convention mean by objection, and did our panel, which explored it as particularized preference, is that not right? Is affinity insufficient, and there's got to be something more demonstrative? Let me give you one case, and then I'll turn to your question. Yeah. A circuit case from the Third Circuit, Yang v. Sui. In that case, the court discussed that the 10-year-old had ordinary 10-year-old concepts, as opposed to something that would demonstrate that that child had more than ordinary maturity. Now, to turn you to your question, and we don't have, of course, in these consuelos, don't have the full record, but what we do have is that the court found that the 10-year-old that demonstrated an understanding of the proceedings had a right to state an opinion, which really isn't, just isn't in the record here. Second, it did . . . he did go to . . . that child went to, at least as found in the description of the facts, both at the district court level and with this court, that he had some very particularized . . . this, I'm happy here, I'm happy there. It's not that level of particularized objection. It might not be, but we have to find clear error in the magistrate who's the one sitting in this room, talking to the child, with lawyers present, and a guardian at him. So what's the relief? We remand back and they've got to ask more specific questions? No. I think if you look at England, which involved a 13-year-old child, as well as Viscount and that 13-year-old child had the same sort of, I prefer the United States and here are some reasons . . . But in England, the issue is the child was not just confused, but had mental disabilities. The child had ADHD, which is not . . . it's a concentration issue. It's not really a mental disability. And wasn't there a suggestion of undue influence? England was all on the maturity prong, not the objection aspect. But what England said is if you look . . . what England says, it looked at both. It looked at . . . and again, England tended to conflate them as well. And what England said is if you look at this child, and this child has ADHD and had an unsettled home life, which may have made her less mature, then it said . . . it also said she did not have particularized objections. What she had, and the same as we have here, are questions she had . . . she had a general preference for the United States and some reasons to support her preference. But in Seale v. Seale, Judge Barksdale's language says that by preponderance of the evidence that the non-removing party was not exercising . . . it says or, it goes into numeracy, that the child is of proper age and maturity and has decided he does not want to return. That's the language of that opinion. In Seale. He decided he didn't want to return. Now that . . . what do we do with that language? Well, in Seale v. Seale, the court ordered return. What the court found . . . and as I recall, Seale v. Seale, the two . . . Well, I'm talking about the formulation of the standard by that panel. I quote it. It goes through the . . . reciting the convention, 12, 13, 20, et cetera, and it enumerates these various custody requirements, not exercising . . . non-removing party, not exercising custody rights, and so on and so forth. Then it says or, the child is of proper age and maturity and has decided he does not want to return. And then, of course, the clear and convincing evidence standard enumerated. So that . . . what struck me about that particular formulation was that decided not to return as meeting the object standard. What Seale . . . what the court in Seale appellant was referring to were two affirmative defenses that are provided under Section 13D of the convention. One affirmative defense is a preponderance of the standard is not exercising rights of custody, which is the point I started with and apparently I'm not going to get to. And the second . . . The briefing gets to it. This is the point that interests us, so go with the . . . No, I know. I know. And the second is, and it's not enumerated within 13D, is this . . . what has been called in the case is the matured file defense. But it is an affirmative defense that is on the burden of the respondent to prove by a preponderance of the evidence that the child is sufficiently mature and has a particularized objection. And in this case, there is not sufficient evidence to support either of those prongs. Yeah, well, to be sure, the opinion insists that the obligation burden was to demonstrate by clear and convincing evidence that the child is a . . . that the child is a child has decided he does not want to return. Can I . . . my time's up. Can I answer? His time is not up, so please answer his question. As . . . as . . . I'm saying to you that under that opinion, it appears that quite . . . that it had to be a demonstration that by clear and convincing evidence, but what was required to be so convincingly demonstrated was that the child did not want to return. And that's the formulation of the language. I just . . . I hate to seize on particular words, but that's unfortunately where we are. Well, as England pointed out, and it's actually a preponderance standard, Your Honor, not an objection to return and is sufficiently mature for those child . . . that child's views to be determinative. And it is, in fact, a separate prong on which a . . . That was another required element, yes. Yes. No, and it is . . . it's maturity plus a particularized objection, but the standard is a preponderance, as this Court made clear in England. Hang on for one more question. Yes. It's a tough case, and my concern . . . you can see questions are as to what level of deference we owe to the firsthand observer of the child on just this affirmative defense. Other than England, are you aware of any circuit case that has reversed a lower court's maturity of the child objection? I know England . . . I want . . . but I need to double-check. I think Yang v. Thwee, maybe, but I want to double-check that. Why don't you give that some thought and . . . May it please the Court, Your Honors. I am here on behalf of the child. I was appointed by the Magistrate Court as the attorney ad litem for the child, and the Court has, with laser focus, nailed exactly the issue that is really dispositive of this case. Well, you can . . . maybe weren't quite laser enough, like, it seems to me you have a pretty weak argument on the first question about whether the magistrate judge properly concluded what should have been concluded, focused too much on custodial rights as opposed to abandonment of the child. Do you have much to tell us on that? I would say this. There is a very, very high hurdle to overcome with respect to deference to the magistrate's findings. Globally, what this case was about was about a mistress who was essentially in a relationship with an adulterer, that being the petitioner. The child was a pawn in this relationship, and of all the contact that the petitioner tried to allege demonstrated exercise of custody rights, and the Court at the magistrate level focused on the 18 months preceding the removal, the child relocated about 300 miles away with the mother because the petitioner had threatened to kill the mother on numerous occasions. Now, this should be of great importance to this Court because in that 18-month period, the father made no meaningful effort to maintain contact with the child. He instead made meaningful effort to exhibit control over the mother. The child's testimony was clear that during that time, and I just want for record purposes to illustrate that distance. We're talking about a distance of between here and Shreveport. That's how far away this mother fled to be away from this man and the abuse. The child made it clear during the hearing, and I know that this is not an issue of custody determination. However, I think intent of the parties has to play into the magistrate's determination of whether custodial rights were being genuinely exercised. I would submit to the Court that this was a sham. There are no photographs of this child with the family of the petitioner. The petitioner kept the child and the mistress a secret from his family, from his spouse. Never introduced the child into his core family. Only showed up on a monthly basis simply to exude control over the mistress and to continue his relations with the mistress. If this was a cohesive family relationship where he was exercising parental rights and control, then there certainly would not have been a five-hour gap between the parties as far as distance. I agree with you with the basic principle that those are relevant to the ultimate question of whether the child objected or not, or can be relevant to that. What do we do with the circumstance that I understand that the mother and the child here are, the status is, they're deportable? I would submit, Your Honor, that that is a... We're arguing about whether the child goes back and they're subject to being both sent back. I would submit that for purposes of this determination, it's of little relevance. I'm going to cite a case into the record. It is 559 F. 3rd. 999. It is a Ninth Circuit case, but it very well lays out the settled standards for evaluating the child's wishes and it also lays out a very specific case with respect to the removal. This case says that unless removal is imminent, now there is the threat that the family does not have a legal status here, but nothing in the record established that imminent removal was to occur. And this case stands for the proposition that if there isn't imminent removal, then that factor should not be relevant. Not relevant to which aspect of the convention? Should be relevant to the decision to return the child to the original jurisdiction of Mexico. In other words, what the petitioner cited in their brief as a factor in this case in the child's ability to decide whether or to object to return to Mexico was this looming question of the status of the mother and child. However, this court plainly said that that should not be a factor unless there is an imminent, and we don't have that in this record. With the court's permission, I'd like to address some of the issues that the court raised. Do you have any or is there any case law out there addressing this situation of the status of the parent that fled? The Hague Convention really addresses the problem of one parent absconding with a child to another country. And I would suppose that many of those situations, the absconding parent may not have status in the domestic, in the forum here in the States. Has that been addressed? I can't find authority to that point, but I would say this. You're absolutely right, Your Honor. That is what the Hague and its intent is to protect, is to protect people who flee for risk, for danger to the child. And there's nothing in this record to suggest that this mother and child can't acquire lawful status in this country. They entered legally. They entered on a tourist visa. Yes, they overstayed. There's nothing in the record to suggest that down the road after this court renders its opinion that the child and mother cannot acquire meaningful legal status. She's in a relationship with a man who, as I understand it, is a citizen. We had moved you to address what looked like a bigger hurdle, which was whether or not the facts here validate a finding of abandonment. And in spite of how severely charged the facts are, it seems undisputed that there was no risk to the child from the father, as the court found, and that the father had paid for all the schooling. So what's your case to get to put to bed a little bit this first issue that would say that you've got abandonment even if the father's paying for all schooling? I think the record isn't clear that he paid for all schooling. I think the petitioner even acknowledged in his own brief, if I'm not mistaken, that the schooling was paid for, partially paid for, and that when the child relocated to five hours away, those payments became less, less... Do you have any case that supports abandonment on the theory that you've described? No, I don't, Your Honor. I would simply suggest this. I think that sealed, the case out of the circuit lays out the standard very well, that the father has to exercise those custodial rights over the child at the time or prior to the removal. In this case, we have an ample record that at the 18 months preceding the removal, the child was not under any sort of meaningful exercise of parental rights by the father. He was five hours away. He made no effort in any Mexican court to establish paternity. He made no effort to establish meaningful visits. He never had the child overnight. He never requested that the child come to his home and stay with his family. It is the law of Mexico that we look to for that point, is it not? It is, and that is where I think petitioner has... They have some unusual doctrine, unusual in the sense that it differs very much from... Absolutely. Because there was no declaration from a Mexican court, there is a presumption that there are parental rights, custodial rights by both parents. Where I think petitioner has gone astray in their argument is that they have made this essentially a legal determination as far as standard of proof and burden. This is a strictly factual determination, and the court has very, very well noted that it is only under clear error. What this court must determine in order to reverse the magistrate's finding is, is there no plausibility whatsoever that the child was abandoned? If this court can find no plausibility that the magistrate could not find a single plausible reason to find abandonment, then the court has the discretion to disrupt. The question narrows to whether or not the custodial rights that the father here had in Mexico have been exercised. I don't think there's a challenge that you could make the argument that under the law of Mexico he did not have such. That is a legal determination. You agree with the issue, what narrowly stated is whether he exercised those rights that Mexico gave him. It would be difficult for me to say that he exercised the rights as Mexico gave them. That's the question of whether he did or did not do so. I would submit that he did not exercise meaningful parental rights. What does the law of Mexico contemplate? Your Honor, it's difficult for me to, I know that there was an offer in the record of what those standards were. The magistrate makes note in the findings of fact that there was an omission with respect to the generalized Mexican law. I believe it's characterized, the concept itself I believe is called, and you'll forgive me, I believe it's a Latin term. I'm sorry. I apologize, it's escaping me. It was something very close to what we would call a cheat, which is quite different, but it is a phrase. It appears in my estimation that it would be a low threshold, much inconsistent with the Hague standard. But I would submit that again, the father, the petitioner in this case, failed to meet that standard because what he essentially was doing was using the child as a means to exercise control over the mistress. He was not genuinely interested in having a relationship with the child or else he would have put forth a record of that, and he didn't. Well, counsel, why don't we look at the second issue, the age of maturity and the statement of desire? I'm very happy to look at that issue, Your Honor, because I think that is a very germane issue and I think that that is the deciding factor in respecting the magistrate's finding. The court has very well concluded that it is a clear error standard and the degree of And I can say to the court that counsel did not submit questions. In fact, the court made it very clear that counsel could be present. However, they sat behind the child. The child The magistrate did not want in advance any discussion about what questions ought to be asked of the child? There was nothing in the record that I can recall of any advance questioning. And I would say this, with all deference to the magistrate, if the magistrate had concerns about the maturity of the child, because the magistrate was present, the magistrate would have then been prompted to ask those questions about the maturity. If we are to rest on the record that we have in the four corners of the record Our cases have requests for psychological reports. Were those not made here? There was no request for psychological reports. I don't want to interject myself into the record here, but I would submit that if I, as the attorney at law ad litem for the child, as the attorney ad litem for the child, if I had concerns about the maturity level of the child, the psychological stability, the issues of coercion, I would have most certainly moved for that. But the record, well, one, legally, do you have a case where you're below 10, where a child is deemed mature enough to object that it's below 10? I don't think that there is a case that says Just even factually? I don't think there's a case that demarcates an age distinction You remember in this transcript when the court asks, the magistrate says, what does truth mean? Hard question to ask a child, anybody. There wasn't really much of a responsive answer. The child said, well, it's when you tell the truth. And I think if that were the single sole arbiter of the child's maturity, perhaps her response to that But then let the relevant questions become, how does the child object? And how many times was this child asked, in any way, do you not want to go back to Mexico? I think the magistrate court made a finding based upon not only the direct responses of the child with respect to the issue of return, but also the court made very clear findings that support the child's fear and reluctance to return to Mexico, because the child I thought the magistrate judge also asked the question of whether that child was happy when they lived in Mexico. And the child answered, yes. But the child also added, and I'm quoting from the findings. During the in-camera interview, ASFS stated that she rarely saw a petitioner, either in Torreon or Chihuahua, that never lived with her, rarely did anything with her, only interested in seeing the respondent. And there was clear evidence in the record that the child was afraid of the petitioner, because when he showed up, he showed up drunk. But she said she was afraid. She said that directly. And that he had pushed the mother in the presence of the child. All of those things, globally, would suggest to the court, and I think the court had reason to rely on that as an inference, that this child didn't want to go back to Mexico, because going back to Mexico meant further abuse, further control of her mother by this man. So although the child didn't, and there's no requirement of a magic word of objection, this child clearly noted that she preferred the United States, and she articulated why Mexico made her sad. And it was all rooted in the treatment of the father of both the mother and of her. And if petitioners are going to rely on England as their bedrock case, I would submit that is not a good footing, because England dealt with a child who was severely vulnerable to undue influence, had issues with respect to ADHD, and had four mothers in her life. Let me ask you a question, focusing on the choice of the child under the Hague Convention. In a domestic custody fight, you would have a child in maturity, a judge would make the determination of deciding custody, would consider, among other things, in Texas, the preferences of the child as between the parents, and whether they're happy or not. Here, what's been, where testimony about, I'm afraid, et cetera, would be relevant. Here, the law arguably segregates, slices off that determination as being the problem of the original domestic country, as resolving those kinds of disputes over custody. Instead, wants to elevate this to a choice of countries, and I have trouble figuring how you do that in application in these kind of cases. How do you distinguish between the preference of a child expressed in terms of a, here, objecting to the status, if it's the law that they just don't want to go back to Mexico, independent of custody? If that's the law, then that's one thing. But if it is, in the real world, the situation that it's a mixture of both, I don't know how you, what we do with that. I think what Petitioner is attempting to do is to say that because the child expressed that she wanted to stay in America with her mother, that that somehow inferred that she was making a custody decision. I think that's going too far, because the child expressed she wanted to stay in America for other reasons, and the child clearly expressed why she was afraid to go back to Mexico, for very clear and compelling reasons that the magistrate found to be very, very credible. Because, again, this is a credibility issue that the magistrate was in the best place to assess. But that segmentation doesn't always cut against you, because she also said that she preferred to be in the United States because of the opportunities, the education, et cetera, et cetera. Now, that is speaking in terms of choosing countries rather than parents. If that would have been the sole record in this case, I would have to acknowledge you're absolutely correct, because the precedents would be against me in this circuit. But the child went further and gave very graphic detail of the reasons that Mexico was not good for her, and those reasons were clear on the record. Now, they do overlap with custody. I acknowledge that, but we have to be mindful that we're dealing with a child who, in her world, everything radiates out from her home, from her custody, from her level of protection. It is her family. So everything radiates from that focal point. However, I believe the magistrate, if the magistrate had concerns about maturity, the magistrate would have certainly inquired further. If the magistrate had concerns that there was not a clear statement of objection, the magistrate would have inquired further. But I believe that the record and the magistrate's findings, which this court must find and give deference to under the circumstances, there is not clear and convincing evidence that the magistrate erred in this case. There wasn't a magic word. Absolutely true. There was no magic word of objection uttered. But nevertheless, it was very clear that the child had a stated reluctance to return to Mexico because of the abuse and because of the fact that she was essentially a pawn in this relationship, and that that was not at all what she wanted to return to. Now, I think that the court very aptly cited the Vasconcelos case because this case really does boil down to exactly what the factual standard is in this case. In the other cases cited and discussed, including the Cyce Yang case, there was an issue with respect to maturity, but I don't believe that that issue ties into the facts of this case specifically because, again, an ad litem attorney was there. The court had ample opportunity to assess the child and made no finding that there needed to be additional inquiry into the maturity of the child. Therefore, I think the petitioner in this case has failed to carry their burden with respect to establishing exercise of custody, and I believe that the respondent has very well established that there was abandonment in this case and that the child's preference and the child possessed the degree of maturity to make that preference in this case. And I would ask that this court honor the ruling of the magistrate court and the adoption of that ruling by the district court because it is clearly supported by factual findings and that those factual findings should not be disrupted unless the court can find no plausible basis to support the magistrate's findings, which I don't think exists here.  Thank you, Your Honors. To answer Judge Higgins' question for me, is there another circuit court opinion overruling a decision that the child was sufficiently mature? The only one that I found is England. But I think this case is England because the findings in England are identical to the findings here, and that's because the court, the district court in England had found that the child was, that she had objected, and she's old enough. And this court held that that wasn't sufficient. Let me ask you a question. If we're left with a sense that the findings are just inadequate to tell us one way or another about this, why shouldn't we remand the case back to the magistrate judge to clarify his findings one way or another? It's because it's a question of evidence, Your Honor. And as England noted, burden of proof matters. The court does not start this determination from ground zero. The respondent has the burden of proof. So if there isn't sufficient evidence to demonstrate both maturity— I agree with that. But if we conclude that our difficulty is the absence of clarity in the magistrate's If that's the only issue, Your Honor, then that's probably the correct result. But my submission is the evidence that's presented does not provide sufficient evidence from which a court could find maturity. As this panel's noted, the question about her, what is the truth? And that's, I think, a very telling question because she didn't come up with a good answer. And that goes to maturity. I think the other— With all respect, that is such a philosophical question. I might ask you what is truth, but I don't think we need to take up that time. I'm not sure that's the best example of someone not being mature. It is an example, Your Honor, that courts have looked at. Where you find courts finding that children, particularly younger children, are sufficiently mature, they ask that question, and they're convinced that the child gives an answer that's not a non sequitur. What's your sense of what the child has to be mature enough to know? Looking at this desire and whether she is sufficiently mature to state a desire of not returning to Mexico, what level of knowledge, maturity, conceptually, does that require? I think it requires, first of all, that the child be able to give an answer to what is truth, even if it's as simple as things that are right, things that aren't made up. I mean, those are child responses, but— But when looking at desire, it seems to me what the Hague Convention is talking about and are looking at the maturity for it is whether she or he has formed a sufficient knowledge of surroundings, of relationships, of what is good and bad for that person to state a desire at that level. We're not trying to find out if she's mature enough to go to college. We're trying to see if she's mature enough to do what's necessary under the Hague Convention, which is to state a desire. So that's—I'm not looking at what the evidence would be to support that necessarily, but it does seem to me to be a little bit slippery on how you match up maturity to the issue before us. I mean, I think that—and it's a little bit of an amorphous concept because the convention itself doesn't set any real guidelines. But I think what you—the child needs to be able to have that maturity is to be able to answer truth versus lie question. The child needs to be able to make a comparison and contrast of life between Mexico and be able to distinguish. And I think that's very key in my friend's comments over here that she has to be able to make a difference and to really understand the proceeding that there is a difference between where am I going to live and with whom am I going to live because there is nothing in any of the Hague Convention law that says if the child has returned, she goes to her father. The Hague Convention, and a common result and could easily have been the result in this case, is both parents, both mother and child return to Mexico, and a Mexican court sorts this out. All of these issues, I don't like my father, I don't want to live with my father, are inevitably custodial questions. But at the very end of this transcript, the last set of questions was purely locational. Where are you happier, Texas or Mexico? Texas. Why? Because I can learn more languages here and something else. It sounds like a fairly mature, particularized choice. But that is exactly the same sorts of reasons a child gave in England that a prior panel of this Court said was insufficient. Let me note something to both parties. We got a letter, I don't know if it was in the form of a 28-J from the State Department, in the last few days, I saw it recently, inviting us to contact. Does that strike either one of you as a problem? Were we to proceed? I have no idea any of our three of us would be interested in doing that. Would there be an objection? We may well have the right to do it regardless of whether there's rejection, but I wanted to know just what your reaction to that invitation was. You did see the letter? I have seen the letter. My reaction is I think that this Court should avail itself, if it wishes, of any opportunity to learn more of the law and the structure relating to the Hague Convention. If the court system in the United States has set up what appears to be, and I'm not entirely familiar with the concept, an educational program or at least mentor judges is how I read the letter, I would certainly have no objection. I would point one thing out, is that letter mentions the name of the child, which I understand is in violation of local rules, and I think we're all in agreement that the child's name should be redacted or at least that letter sealed. Thanks for pointing that out. I would share Mr. Mack's position, Your Honor. Whatever the court can plead for the cooperation of the department, it is certainly the court's purview. And I would add, then, yes, if the court could please enter an order to seal that letter because it does disclose the child's full name. I called the clerk's office yesterday to put them on notice of this. I spoke with the in-court clerk about it, and she's already working on that, but I just want to make that clear for the record that we would join that request. Good work by you both to point that out. Thank you, Counsel. Thank you, Your Honor. Let me thank both of you for a quality argument in a very difficult case. I really do appreciate that, and I particularly commend your relationships with one another in a difficult case. Each of you may have referred to my friend, and it almost sounds like you meant it, so that is good.